FILED
11/10/14 3:41 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Misc. No. 13-00203-GLT |
| | : | |
| ALL CASES IN WHICH JASON J. MAZZEI | : | |
| IS ATTORNEY OF RECORD | : | |
| | : | |
| | : | |
| JASON J. MAZZEI, ESQ. and | : | Related to Doc. Nos. 17 and 68 |
| PAUL W. MCELRATH, JR., ESQ., | : | |
| | : | |
| Movants, | : | |
| | : | |
| v. | : | |
| | : | |
| RONDA J. WINNECOUR, Chapter 13 | : | |
| Trustee, | : | |
| | : | |
| Respondent. | : | |
| | : | |

## <u>MEMORANDUM OPINION</u>

This matter is before the Court upon the *Motion to Approve Joint Stipulation* [Doc. No. 17] (the "Motion to Approve") and the *Motion to Modify Order of Court dated March 7, 2014* [Doc. No. 68] (the "Motion to Modify") filed Jason J. Mazzei, Esq. and Paul W. McElrath, Jr., Esq. The *Motion to Approve* requests an order directing the chapter 13 trustee (the "Trustee") to release monthly distributions of legal fees to McElrath Legal Holdings LLC ("MLH") for those cases transferred to Attorney McElrath through an *Order Granting Motion to Substitute Paul W. McElrath, Jr. as Attorney for Jason J. Mazzei* entered on March 7, 2014 [Doc. No. 15] (the "March 7 Order").[1] The *Motion to Modify* seeks to amend the March 7 Order by clarifying that the affected cases were transferred to MLH, and not Attorney McElrath as a member of the law firm of Mazzei & Associates ("M&A"). After consideration of these matters, both motions are denied, subject to further proceedings as provided herein.

---

[1] The cases transferred pursuant to the March 7 Order are referenced herein as the "Transferred Cases."

The conduct of Attorney Mazzei and his firm, M&A, have been scrutinized by the Court for some time, culminating in a disciplinary proceeding which is currently pending against him.[2]  In an attempt to shield himself from further inquiries, Attorney Mazzei impetuously transferred his practice to Attorney McElrath and his firm, MLH.  When confronted with questions that highlighted the unanticipated consequences of their actions, Attorneys Mazzei and McElrath materially altered the characterization of their transaction and certain events to fit an ever-changing narrative.  Desperate to avoid any impact the transaction might have on his ability to practice law, Attorney Mazzei offered testimony that is inconsistent with the record and defies common sense.  Attorney McElrath was similarly evasive, first admitting and then denying the existence of a written agreement between the parties.  The result is a tangled web of conflicting and contradictory statements in a convoluted record in which the transaction has been described as an asset sale, a transfer of equity, and a gift, all in the span of several months.  The parties' lack of candor has therefore transformed a seemingly routine matter into a protracted proceeding that necessitated multiple hearings and an extensive discussion to determine the true nature of the transaction.[3]

## BACKGROUND

Attorney Mazzei is a consumer bankruptcy lawyer whose practice primarily involves the representation of debtors in chapter 13 bankruptcy proceedings.  He has filed cases in this Court under the name of "Mazzei & Associates" since at least 2000.[4]  In April 2008, he

---

[2]    See Case No. 14-205-GLT.

[3]    This miscellaneous proceeding aggregates the relief requested in numerous cases wherein the parties seek the substitution of counsel and an Order re-directing the payment of fees.  As to each case, this matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), and the Court has subject matter jurisdiction pursuant to 28 U.S.C. §1334(b).  This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

[4]    See In re Hernandez, Case No. 00-02144-JKF.

formed the law firm of M&A as a separate legal entity.[5]   M&A has become one of the more

prolific filers in this Court.  By 2012, M&A was responsible for approximately 20% of the

pending chapter 13 cases in this District.[6]  Until November 2013, Attorney Mazzei was the sole

shareholder of M&A.[7]

        In chapter 13 cases, M&A charges for its legal services on an hourly basis, subject

to a minimum, non-refundable fee equivalent to the "no look" amount established by the Court

under W.PA.LBR. 2016-1(f).[8]   M&A must obtain Court approval before it can receive payment

for any legal fees incurred in excess of the "no look" amount.

        M&A's revenues largely derive from two sources.  It typically collects a portion

of its legal fees from clients in the form of a retainer at the outset of an engagement.  The

residual balance of the fee is paid in installments as part of the Trustee's monthly distribution

under a confirmed chapter 13 plan.  These installments may be paid over the course of several

years.  Given the number of active cases in the firm's inventory, the cumulative distribution

payable by the Trustee to M&A in any given month is substantial.

        Attorney McElrath is a local bankruptcy attorney who was previously associated

with the law firm of Moody & McElrath or Moody, McElrath & Johnston, P.C.[9]  In September

---

[5]     Doc. No. 54, *Transcript of May 30, 2014 Hearing* ("May 30 Trans.") at 43:24-25; 44:1-5.

[6]     See In re Brigger, Case No. 12-11352-TPA, Doc. No. 61, fn.6.

[7]     May 30 Trans. at 44:13-15; 45:24-25; 46:1.

[8]     The "no look" fee is the maximum legal fee an attorney can collect in a chapter 13 case without the necessity of filing a fee application.  See W.PA.LBR 2016-1(f).  The "no look" attorney fee in this District is currently $4,000, and the "no look" expense charge is $500.  Id.

[9]     See, e.g., In re Rogers, Case No. 03-22311-TPA.

2012, he approached Attorney Mazzei about obtaining a job with M&A.[10]  In response to these overtures, Attorney Mazzei suggested that Attorney McElrath consider buying into the partnership because Mazzei was looking to get "out of this rat race[.]"[11] This eventually led to a discussion about Attorney McElrath taking over Attorney Mazzei's practice.[12]  Attorney McElrath indicated a willingness to buy M&A's practice provided he could have an opportunity to conduct due diligence regarding the firm's operations.[13]

On or around October 2012, Attorney McElrath began working as a staff attorney for M&A.[14]  Although considered an employee at the time, Attorney McElrath claims he was surreptitiously evaluating the viability of the business to determine whether he could commit to an acquisition of the practice.[15]

Initially, the two attorneys discussed a sale of the firm's assets.[16]  By early 2013, however, the Court began to closely scrutinize Attorney Mazzei's billing practices and the propriety of his actions in its loss mitigation program.[17]  The Court's inquiry culminated in the appointment of an expert to investigate the operations of Attorney Mazzei and M&A.[18]

---

[10]    Doc. No. 30, p. 1.   The record does not establish that Attorneys Mazzei and McElrath were anything other than casual acquaintances at the time.

[11]    May 30 Trans. at 40:1-8; see also Doc. No. 30, Exhibit A (an e-mail that is curiously undated); see also Doc. No. 78, *Transcript of July 31, 2014 Hearing* ("July 31 Trans.") at 27:5-21.

[12]    Doc. No. 30, p. 1.

[13]    Id.

[14]    Id. at p. 2.

[15]    Id. at p.1; May 30 Trans. at 40:9-18.

[16]    Doc. No. 30, p. 2.

[17]    See In re Brigger, Case No. 12-11352-TPA, Doc. No. 57; see also In re Dietrich, Case No. 11-23556-CMB, Doc. No. 124.

[18]    See In re Dietrich, Case No. 11-23556-JAD, Doc. No. 131, p. 3-4.

Attorney McElrath claims this inquiry, and the uncertainty of its outcome, caused him to resist efforts to enter into a definitive purchase agreement.[19]

Notwithstanding his reservations, Attorney McElrath ultimately decided to proceed with the transaction in July 2013 when Attorney Mazzei expressed a desire to discontinue his bankruptcy practice.[20]   Attorney McElrath formed a limited liability company, MLH, to take over the M&A practice.   Thereafter, the parties reached an agreement to transfer M&A's assets to Attorney McElrath's new entity.[21]   The transfer included M&A's entire case inventory (subject to both client and Court approval), as well as all personal property used to operate the firm.[22]

Beginning on July 26, 2013, notice of the acquisition was released to the public. On that day, Attorney McElrath informed M&A's employees that he was taking "exclusive control" of the firm on August 1, 2013 due to an ownership change.[23]   In August, an undated letter was sent to M&A's clients (approximately 1,500 in total) informing them of "important changes that have occurred at Mazzei & Associates."[24]   The letter told the clients that Attorney McElrath was now the "owner" of M&A, and he offered a meeting to discuss the "switch in firm ownership."[25]   Attorney Mazzei reviewed the letter prior to its release and authorized its

---

[19]     Doc. No. 30, p. 2.

[20]     Doc. No. 30, p. 2; May 30 Trans. at 9:17-20.

[21]     May 30 Trans. at 9:25-10:5; 10:18-20.

[22]     Id. at 10:10-11:24.

[23]     Doc. No. 30, Exhibit D; see also May 30 Trans. at 61:2- 62:7.

[24]     Doc. No. 30, Exhibit F; Doc. No. 68, ¶ 4 and Exhibit A; May 30 Trans. at 64:24-65:6.

[25]     Doc. No. 30, Exhibit F; Doc. No. 68, ¶ 4 and Exhibit A.

distribution.[26]   At the time, Attorney McElrath did not hold any equity in M&A.[27]   Attorney McElrath claims he received no "negative responses" to this letter from M&A's clients.[28]

Contemporaneously with the announcement, Attorneys Mazzei and McElrath implemented the transfer of M&A's practice to MLH.  MLH received a conveyance of all assets necessary to operate the law practice including M&A's client files,[29] accounts receivable,[30] vehicles,[31] and certain intellectual property, including the rights to the firm's website, phone number, and use of the name "Mazzei & Associates."[32]  Moreover, all M&A employees became employees of MLH on September 1, 2013.[33]   In all, approximately 15 employees were transitioned to the new firm, including Attorney Mazzei.[34]

MLH agreed to bear a number of significant liabilities associated with M&A's operations.   MLH took possession of approximately 23 offices maintained by M&A, and it

---

[26]   May 30 Trans. at 64:14-19; 65:12-15.

[27]   May 30 Trans. at 46:6-11; Doc. No. 30, p. 3,-4.

[28]   Doc. No. 68, ¶ 5.

[29]   May 30 Trans. at 10:21-11:9; 13:6-8.

[30]   The parties transferred the right to collect the accounts receivable, subject only to the entry of a Court Order authorizing the chapter 13 trustee to release funds to MLH that were otherwise payable to M&A.  Id. at 13:15-18; 14:20-17:7.

[31]   Doc. No. 30, Exhibit Q.

[32]   May 30 Trans. at 26:12-27:20.

[33]   May 30 Trans. at 17:14-18:2.

[34]   May 30 Trans. at 18:9-22; 55:4-56:3.  Attorney Mazzei received a salary from MLH through approximately April 20, 2014.  Since then, he claims he is working as a "volunteer" to close out those cases where the client has not consented to a transfer to Attorney McElrath.  It is not clear what work Attorney Mazzei is doing for MLH since any legal services rendered on the residual M&A cases would presumably benefit M&A if the cases are not transferred to MLH.

assumed the remaining lease obligations for each location.[35]   MLH also became responsible for

M&A's obligations with respect to certain trade vendors and utility providers.[36]

   With the foundation of this new firm in place, M&A became a shadow of its

former self.   While it remained counsel of record for hundreds of cases, it had neither the

employees[37] nor the assets to effectively manage those cases on its own.   Instead, MLH took

over all business operations.   Attorney McElrath represents that, as of August 2013, all new

bankruptcy cases were commenced under the name of MLH.[38]   In addition, all revenues were

deposited into a bank account owned by "McElrath Legal Holdings, LLC practicing as Mazzei &

Associates."[39]   These deposits were made without distinction as to whether the funds were

generated from cases initiated by M&A or MLH.

   On September 24, 2013, Attorneys Mazzei and McElrath commenced this

miscellaneous proceeding before the Honorable Thomas P. Agresti for the purpose of

withdrawing the appearance of Attorney Mazzei in approximately 1,841 cases, and substituting

Attorney McElrath in his place.[40]   The Court initially denied the request without prejudice

because the parties failed to establish a legal basis for the transfer.[41]   Specifically, the motion did

not include evidence that the clients consented to the substitution, nor did it include reference to

any provision under applicable law or the respective fee agreements that would authorize a

---

[35]      Id. at 13:8-14; Doc. No. 30, p. 4.

[36]      May 30 Trans. at 25:7-12; Doc. No. 30, p. 4 and Exhibit O.

[37]      See July 31 Trans. at 6:12-18.

[38]      May 30 Trans. at 9:25-10:20; 41:12-15.

[39]      May 30 Trans. at 58:13-17; see also Doc. No. 30, p. 2.

[40]      Doc. No. 2, *Omnibus Joint Motion to Withdraw the Appearance of Jason J. Mazzei, Esquire and Enter the Appearance of Paul W. McElrath, Jr., Esquire*.

[41]      Doc. No. 3.

substitution of counsel without client consent.  After a subsequent effort to transfer the cases was

denied in October 2013, the miscellaneous proceeding was closed.

In December 2013, Attorney McElrath sent a letter to M&A's clients requesting

their signature on a form consent agreement ("Form A").[42]  Through Form A, clients agreed to

hire Attorney McElrath and discharge Attorney Mazzei, subject to the terms and conditions of

their original fee agreement with M&A which was "assumed and transferred" to Attorney

McElrath.[43]  The letter was prepared on M&A letterhead and contained no reference to MLH.

Rather, it suggested the consent was related to Attorney McElrath's "new position as lead

attorney" at M&A.[44]  Approximately 673 M&A clients returned a fully-executed copy of Form

A to Attorney McElrath.[45]

Due to client confusion over whether he was charging a fee for the transfer,

Attorney McElrath sent an additional letter to M&A's clients in January 2014, containing an

amended consent agreement ("Form B") for the clients' review and approval.[46]  Once again, the

letter was sent on M&A letterhead.  Although it referenced "changes in management," the letter

failed either to make mention of MLH or to disclose the transfer of M&A's practice to a new

firm.

Form B was substantially similar to Form A, with two exceptions.  First, it

confirmed that clients would not be billed for work associated with the "change in

---

[42]    See Doc. No. 68, ¶ 7 and Exhibits B and C; see also Doc No. 30, p. 3 and Exhibits G and H; see also Doc.
No. 78, July 31 Trans. at 8:9-25.

[43]    See Doc. No. 68, ¶ 7 and Exhibits B and C; see also Doc No. 30, p. 3 and Exhibits G and H.

[44]    The letter also made reference to certain "changes in management[.]" Id.

[45]    See Doc. No. 68, ¶¶ 10 and 13.  The identities of these clients and the date they executed Form A is listed
on Exhibits F and H; see also July 31 Trans. at 9:8-16.

[46]    See Doc. No. 68, ¶ 8 and Exhibits D and E; see also Doc. No. 30, p. 3 and Exhibits G and J.

representation."  Second, it identified Attorney McElrath and MLH as the new attorney, in place

of Attorney Mazzei and M&A.  Despite this oblique reference, no explanation was provided to

clients as to the role of this new firm.  Form B was executed by approximately 344 clients.[47]

On March 3, 2014, Attorneys Mazzei and McElrath filed a motion to reopen the

miscellaneous proceeding and simultaneously requested an order transferring the M&A cases to

Attorney McElrath (the "Motion to Withdraw").[48]  This time, the motion requested a substitution

of counsel in each of the 935 cases in which the debtors "personally consented in writing to the

withdrawal[.]"[49]  By Order dated March 7, 2014, the Court reopened the miscellaneous

proceeding and authorized the withdrawal of Attorney Mazzei and the substitution of Attorney

McElrath in each of the enumerated cases identified in the motion.[50]  Importantly, the March 7

Order did not authorize a transfer of cases between law firms and neither the motion nor the

proposed order requested a transfer from M&A to MLH.

Attorney McElrath was motivated to obtain a substitution order because he

wanted to compel the Trustee to transfer the legal fees payable on M&A's cases directly to

MLH.  This included legal fees for work done prior to the substitution order when the cases were

in the name of Attorney Mazzei.  Although the parties originally requested an order directing the

payment of such funds to Attorney McElrath, the Court denied this request by omitting the

requested language in the March 7 Order.

---

[47]     See Doc. No. 68, ¶¶ 11 and 14.  The identities of these clients and the date they executed Form B is listed
on Exhibits G and I; see also July 31 Trans. at 9:17-23.

[48]     See Doc. No. 11, *Omnibus Joint Motion to Withdraw the Appearance of Jason J. Mazzei, Esquire and
Enter the Appearance of Paul W. McElrath, Jr., Esquire*.

[49]     Id.  Although the motion contained a listing of cases in which consents were obtained, it did not identify the
type of form executed by the clients.  At the time the motion was granted, the Court was unaware that two
different consent forms existed.

[50]     See Doc. No. 15.

On April 3, 2014, the *Motion to Approve* was filed in an effort to revisit the payment of fees by the Trustee.[51]  It contained a stipulation between Attorneys Mazzei and McElrath wherein they each agreed that fees held by the Trustee on account of M&A could be transferred to MLH.[52]  Upon scheduling a hearing on the *Motion to Approve*, the Court directed the parties to address several areas of concern, including whether the proposed transfer would constitute the type of "fee sharing" prohibited by 11 U.S.C. § 504(a) or the Pennsylvania Rules of Professional Conduct.[53]

At the April 29, 2014 hearing on the *Motion to Approve*, neither Attorney Mazzei nor Attorney McElrath presented any statutory authority to support their request.  To further complicate matters, Attorney Mazzei and Attorney McElrath presented conflicting testimony regarding whether a sale of the practice had, in fact, occurred.  On one hand, Attorney Mazzei testified that no sale of the practice had taken place.[54]  On the other hand, Attorney McElrath testified that a sale did occur and that he was in possession of written documentation of the transaction.[55]  Recognizing that additional inquiry was needed, Judge Agresti issued an order to preserve the status quo until a final determination could be made.  On an interim basis, he authorized the Trustee to release M&A's monthly distribution check for April 2014 to MLH "as an accommodation to the affected debtors currently represented by Mazzei and/or Mazzei & Associates[.]"[56]  The order was without prejudice to the Court making a determination at a later

---

[51]    See Doc. No. 17.

[52]    Id.

[53]    See Doc. No. 18.

[54]    Doc. No. 27, *Transcript of the April 29 Hearing* ("April 29 Trans.") at 6:22.

[55]    Id. at 7:19-25, 8:1-6.

[56]    See Doc. No. 22.

time as to which party is entitled to receive such funds, and whether sanctions should be assessed

for any improper conduct.

After the miscellaneous proceeding was subsequently assigned to the

undersigned,[57] Attorney McElrath made a similar request for the release of the May 2014

distribution from the Trustee.[58]    At the hearing on this request, Attorney Mazzei and Attorney

McElrath again presented conflicting and contradictory testimony.[59]    However, in direct

contradiction of his testimony at the April 29 hearing, Attorney McElrath now claimed that no

written records exist to memorialize the agreement between himself and Attorney Mazzei.

---

[57]    Attorney Mazzei filed a motion seeking the recusal of Judge Agresti in all matters in which he appears as attorney of record.  [Doc. No. 35].  For the reasons cited in his Memorandum Opinion dated June 10, 2014, Judge Agresti found no legal basis to recuse himself and denied the substance of the motion.  [Doc. No. 50].  Nevertheless, Judge Agresti elected to exercise discretionary recusal as it pertains to this case as well as the miscellaneous proceeding at Case No. 14-00205 (*In re Matters Involving the Professional Conduct of Jason J. Mazzei, Esq. and d/b/a Mazzei & Associates in Matters Before the Court*).  [Doc. No. 50].  Chief Judge Jeffery A. Deller assigned the matters to this Court in a Memorandum Order dated June 10, 2014 [Doc. No. 52].

[58]    Doc. No. 34.

[59]    Attorney McElrath testified that he purchased the practice:

> Q:    …[W]as it your understanding you were going to be purchasing the assets?
>
> A:    Yeah, ultimately that our deal would be that, yes, that I was getting the firm.

Doc. No. 54, May 30 Trans. p. 12:6-9.  Attorney Mazzei contends that a sale did not occur:

> Q:    …And Mr. Mazzei, is that consistent with your understanding?
>
> A:    I don't think there was gonna be any purchase, Your Honor.  There was – as to the assets, there was gonna be a transfer of the assets to his name, and there was gonna be [a] relinquishing of those assets on my end.
>
> Q:    So your position is you were gifting all of this to him, that you were going to receive no consideration whatsoever in exchange for any of these assets?
>
> A:    Correct, and I didn't receive any consideration….

Id. at 12:10-20.

Moreover, Attorney Mazzei asserted that the transfer was a gift, not a sale.[60]  Troubled by these inconsistencies, the Court ultimately authorized the release of the May 2014 distribution, but it did so while reserving its decision concerning the characterization of the transactions and whether the transfer constituted impermissible fee sharing.  The Court issued similar orders with respect to additional distributions accruing in the following months.[61]

The *Motion to Modify* was filed in an effort to effectuate the transfer of cases from M&A to MLH.  Attorney McElrath claims he received written consents from 1,017 clients using both Form A and Form B.[62]  Although affirmative consent was requested from all M&A clients, approximately 147 clients have yet to respond.[63]

## DISCUSSION

Through the pending motions, the parties seek two forms of relief.  First, they request a modification of the March 7 Order to authorize the substitution of MLH in all matters where M&A is counsel of record.  Second, they request an order directing the Trustee to release distributions to MLH of funds otherwise payable to M&A.  Both issues require the Court to analyze the nature of MLH's acquisition of M&A's law practice, including its accounts receivable.  After this determination is made, the Court can then assess whether the cases and related fees should be allocated between the two firms.

---

[60]    Attorney Mazzei's legal counsel contends that a sale did not occur because consideration did not change hands.  See May 30 Trans. at 5:8-24 ("And it would be our position for Mr. Mazzei that this is not a sale of the practice.  This is a transfer of the practice to Mr. McElrath….  There's no consideration that would make it a sale.  There's no money transferred or anything else transferred of value to make it a sale."); see also id. at 8:2-6 ("It's just that there is no consideration in this case, there's no sale.  That's the definition of a sale, something for value for something else.  Just giving him the practice, letting him take over the practice, is not a sale of the practice.").

[61]    See Doc. Nos. 66, 75, 80, 83, and 86.

[62]    Doc. No. 68, Exhibits F, G, H, and I.

[63]    See Doc. No. 68, ¶15.  A listing of the non-responsive clients is contained on Exhibit J; see also July 31 Trans. at 11:2-16.

A.        **Ownership of M&A Receivables.**

MLH cannot receive payment of M&A's fees if it does not have an ownership interest in M&A's accounts receivable.  To establish this interest, MLH must demonstrate that it acquired these rights from M&A.  The Court is now faced with the difficult task of parsing through the record to determine whether the agreement between Attorney Mazzei and Attorney McElrath (of which no written document exists in the record) constitutes a sale of M&A's practice and thereby establishes MLH's interest in M&A's accounts receivable.

Regardless of the parties' classification of the transaction, one thing is certain -- a transfer of the M&A practice undoubtedly occurred.  Any effort to deny this is belied by the parties' actions and their testimony.  In July 2013, the parties began discussing a sale and by September 2013, all material assets of M&A were conveyed to MLH.  The new firm took over M&A's office locations[64] which were staffed with essentially the same personnel who previously worked for M&A.  Attorney Mazzei himself was a paid employee of MLH from September 2013 through approximately April 20, 2014.[65]  Although the Court has yet to approve the substitution of counsel, MLH handles the work on all cases that were previously service by M&A.

The monetary value of the firm was also transferred.  M&A authorized the assignment of all fee agreements and client files to MLH.  MLH received the right to collect M&A's receivables, bill for any work-in-process, and it obtained the ability to file new cases from leads garnered through M&A's solicitation efforts.  All revenues payable to M&A are now deposited into a Citizens Bank account owned by MLH.  To the extent revenues exceed expenses, the profit remains with MLH.

---

[64]        May 30 Trans. at 13:8-14; Doc. No. 30, Exhibit P.

[65]        May 30 Trans. at 55:4-56:3; see also Doc. No. 30, p. 3.

13

Through the record, it was established that Attorney McElrath now runs the daily business operations of the practice. He controls all disbursements from the Citizens Bank account. Each day, he manages and directs the employees. He possesses exclusive control over the hiring and firing of employees as well as the establishment of employee compensation and benefit rates. In short, the direction of the firm is controlled solely by Attorney McElrath and has been since August 2013. As one example of Attorney McElrath's authority, he removed Attorney Mazzei from the MLH payroll after determining the firm could no longer afford his salary.

Attorneys Mazzei and McElrath also exhibited the outward manifestations of a completed deal. In a statement made to employees in August 2013, Attorney McElrath announced that a transfer was "finalized (at least on paper)." Then, through a series of three letters, M&A clients were informed of the change in firm ownership. When this occurred, Attorney McElrath held no equity interest in M&A. Attorney McElrath also changed the signage in several office locations to remove the reference to M&A.[66]

More importantly, the parties represented to this Court that a transfer occurred when they sought an order re-directing the Trustee's distributions to MLH. Implicit in this request was the parties' assertion that the distributions belong to MLH, not M&A.

Attorney Mazzei was complicit in each of these manifestations. He did not attempt to stop Attorney McElrath from changing the signage and the firm's public identity. He reviewed the letters sent to M&A clients and did not correct or retract the statements made

---

[66]    Attorney McElrath explains that the failure to replace all of the signs at one time was due to monetary limitations rather than a lack of intent. See July 31 Trans. at 20:12-16. For those locations in which M&A still appears on the signage, the Court notes that the parties do not dispute that MLH was given access to M&A's intellectual property, including the right to use the name "Mazzei & Associates." See May 30 Trans. at 26:8-27:20.

therein.[67]   He joined in the motions seeking to transfer all M&A cases to Attorney McElrath and

stipulated to the disbursement of all fees to MLH.   Through these actions, M&A's clients,

prospective clients, employees, and the Court were unequivocally led to believe a deal had been

consummated.   Based upon this record, the Court concludes that an asset transfer occurred and

was finalized as of September 1, 2013, the date when all M&A's employees joined the MLH

firm.

### 1.    A Sale of the M&A Practice Occurred.

Attorney Mazzei argues that a sale did not occur because no consideration was

exchanged between the parties.   He suggests that because cash was not paid at the time of

transfer, he gratuitously assigned the assets to MLH.   The Court is not persuaded by these

arguments.   Attorney Mazzei ignores the fact that consideration can take many forms, and even

modest consideration can support the existence of a sale transaction.   See Antkowiak v.

TaxMasters, 455 F.App'x 156, 161 n.9 (3d Cir. 2011) (consideration is sufficient if it slightly

more than a "mere peppercorn"); Eyre v. Potter, 56 U.S. 42 (1853) (mere inadequacy of

consideration is insufficient to set aside transaction).   Further, consideration need not take the

form of a cash payment to the seller.   Channel Home Centers v. Grossman, 795 F.2d 291, 299

(3d Cir. 1986) (citing Curry v. Estate of Thompson, 481 A.2d 658, 661 (Pa. Super. Ct. 1984))

("Consideration 'confers a benefit upon the promisor or causes a detriment to the promisee and

must be an act, forbearance or return promise bargained for and given in exchange for the

original promise.'"); see also Restatement (Second) of Contracts § 71 (1981) (to constitute

consideration, a performance or a return promise must be "bargained for"); id. at §79, cmt. c

---

[67]       May 30 Trans. at 64-67.

(courts do not inquire into the adequacy of consideration).  The buyer's assumption of a seller's liabilities may therefore qualify as consideration.

In this case, the Court finds ample evidence of consideration to support a sale.  In exchange for M&A's existing case inventory as well as all new cases and referrals, MLH undertook certain liabilities of M&A.[68]  Attorney McElrath acknowledged that MLH became responsible for all employee liabilities related to the practice, including payroll, payroll taxes, and accrued vacation benefits.[69]  MLH assumed M&A's obligations under its real property leases as well as certain vendor agreements.[70]  Attorney McElrath also confirmed that MLH could bear the practical impact of any fee disgorgement imposed upon M&A because this would offset revenues on the cases he acquired.[71]  Through these arrangements, M&A ostensibly freed itself from a significant portion of the financial obligations associated with the firm at a time when Attorney Mazzei's business practices were being scrutinized by the Court.[72]  By assuming existing and future liabilities, MLH tendered consideration to M&A for the assets.

Attorney Mazzei and his counsel would have this Court believe that he transferred a lucrative practice to Attorney McElrath for nothing.  The Court views this as a self-serving attempt to rewrite history.  After MLH acquired M&A's assets, Attorney Mazzei apparently discovered that he could no longer engage in the practice of law in Pennsylvania if the

---

[68]   May 30 Trans. at 15:19-21.

[69]   Id. 20:7-21:15; see also Doc. No. 30, p. 2.

[70]   Doc. No. 30, Exhibit O.

[71]   May 30 Trans. at 42:8-18.

[72]   The assumption of specific liabilities by MLH does not relieve M&A and Attorney Mazzei of any remaining obligations that exist.  In particular, the obligations that derive from any sanctions that may be imposed in the pending disciplinary proceedings are unaffected by the sale, and the Court makes no determination as to these issues at this time.

transaction was characterized as a sale of the practice.[73]  To avoid this fate, he attempts to re-cast the arrangement as a gift to Attorney McElrath, thereby purportedly allowing him to continue practicing law in Pennsylvania if he so chose.

The characterization of the transaction as a gift strains credibility.  M&A represents the culmination of Attorney Mazzei's professional life.  He spent over a decade building the practice into the largest consumer filer in this District.  Based upon the monthly deposits alone, it appears that M&A was generating legal fees in excess of $1,000,000 per year.  By replenishing its vast inventory of cases,[74] there is nothing to suggest these revenues will substantially diminish in the coming years.  This is not an enterprise a reasonable person walks away from empty handed.

Attorney McElrath also does not appear to be a plausible beneficiary of such largesse considering he had no significant relationship with Attorney Mazzei a mere 12 months before the transfer occurred.  He even acknowledged the absurdity of a gratuitous transfer of the practice.[75]  Attorney McElrath conceded that an expectation of additional compensation exists and the parties discussed a specific amount to be paid to Attorney Mazzei.[76]

---

[73]    See July 31 Trans. at 22:18-23; see also Pennsylvania Rules of Professional Conduct 1.17(a) (a lawyer may, for consideration, sell a law practice if the "seller ceases to engage in the private practice of law in Pennsylvania.").  The Pennsylvania Rules of Professional Conduct are hereafter referenced as "Pa. R.P.C." or "Conduct Rule."

[74]    On average, M&A filed 350 new cases per year in 2012 and 2013.

[75]    See July 31 Trans. at 23:18-19 ("I cannot believe that I have just been given this firm."); see also July 31 Trans. at 24:20- 25:11:

| The Court: | Okay, well, when you say wait, does that mean that there would be a contemplation that there would be a downstream payment [to Mazzei]? |
| Mr. McElrath: | Yeah, I believe that there's still an obvious obligation. |
| The Court: | So you believe that after this is all said and done that Mr. Mazzei will come back and ask for additional funding? |
| Mr. McElrath: | Yes. |

The recharacterization is also inconsistent with the facts presented to this Court. Based on their conduct at the time of the transfer, it is apparent that the parties structured a deal to sell the M&A practice to MLH.  In the summer of 2013, Attorneys McElrath and Mazzei indicated that a sale of the practice was in the works.[77]  By September 2013, they informed both their clients and employees that the deal was done.  Ownership of the assets was transferred to MLH and the firm operated as MLH going forward.

Significantly, the parties produced no contemporaneous evidence of donative intent existing at the time the transfer was made.[78]  The Court finds it instructive that no evidence was presented regarding the value (or lack thereof) of M&A's practice.  If Attorney Mazzei attempted to sell his practice but was unable to obtain a willing buyer, the Court would have expected some testimony regarding his unsuccessful efforts to market the assets.  The absence of

---

The Court:      You do?

Mr. McElrath:   I think, yes.

The Court:      And what would be the basis for that?  Is there some sort of –

Mr. McElrath:   Because the alternative strikes me as absurd.  I mean, and that's – and I don't mean
                to be blithe about it, but that's – I'm not living my life as if there's no liability here.

[76]  See July 31 Trans. at 23:25-24:5:

The Court:      Well, did you talk [about] a number before?

Mr. McElrath:   Yep, we had discussions about that, yes.  And I believe fully that were it possible for Mr.
                Mazzei to receive this compensation in such a way that it would not interfere with his
                other legal aims, that I would currently be doing that.

[77]  See Doc. No. 30, Exhibit D; May 30 Trans. at 14:20-25.

[78]  To the extent the transaction was a gift, the Court would have expected the parties to be knowledgeable
      about the potential tax implications associated with this type of deal structure.  The fact that the parties
      lacked familiarity with any of the potential tax consequences underscores the Court's belief that the
      transaction was originally structured as a sale and the "gifting" concept was merely an afterthought See
      July 31 Trans. at 29:3-30:9.

such evidence is compelling.  It leads the Court to conclude that no genuine effort was made to sell the assets to any party other than Attorney McElrath.

The motive behind the attempted reclassification also rings hollow.  Attorney Mazzei made no reference to his purported "gifting" of the firm's assets until appearing for a hearing on May 30, 2014.  Prior to that time, Attorney Mazzei, through his actions and words, contended that a sale was in the works but was not yet consummated.[79]  His new spin on the transaction is curious because it follows the entry of Judge Agresti's *Order to Show Cause* dated April 3, 2014.  This Order marked the first time Attorney Mazzei was questioned about his ability to continue the practice of law pursuant to Conduct Rule 1.17 following the sale of his law firm.[80]  The record suggests that until that Order was issued, Attorney Mazzei did not contemplate the ramifications a sale might impose on his license to practice law.

Unfortunately, this appears to be part of a pattern by both parties to manipulate the facts to fit within a chosen narrative, irrespective of whether it comports with reality.  The record is replete with numerous instances where the parties provided statements that are inconsistent with their prior actions or admissions.  Each time, it appears their explanation of the transaction was altered in response to critical questions raised by the Court.  In one instance, Attorney McElrath confirmed under oath that a written agreement existed between the parties.[81]

---

[79]     See, e.g., May 30 Trans. at 15:20-25 (wherein Attorney Mazzei acknowledges that an attempt to transfer the receivables held by M&A to MLH occurred in August 2013).

[80]     See Doc. No. 3, pg. 9 in Case No. 14-00205-GLT.

[81]     Attorney McElrath testified as follows:

The Court:     …Do you have any written document between the two of you [Mazzei and McElrath]?

McElrath:     Me buying his assets.

The Court:     Do you have a – is that a yes?

This testimony was supported by the public statements made in August 2013 which indicate that the parties "finalized, ***at least on paper***, the transfer of this firm to [McElrath's] exclusive control."[82]    Nevertheless, when Attorney McElrath failed to produce the document, he contradicted his sworn testimony and claimed a written agreement did not exist.[83]  To justify their reversal, the parties now claim they have an enforceable agreement but it was never reduced to writing.[84]

The revisionist history does not end there.   In November 2013, the Court-appointed examiner questioned how Attorney McElrath could receive M&A's distributions when he was not affiliated with the law firm.[85]  The very next day, Attorney Mazzei caused 255 shares of M&A stock to be issued to Attorney McElrath, ostensibly to give Attorney McElrath a 50% ownership stake in the M&A law firm.[86]  Because the shares were issued from the firm's treasury rather than from Attorney Mazzei's personal holdings, the total number of outstanding

---

McElrath:    Yes, Your Honor.

The Court:    Okay, I want to see that.  I want you to file it, and if you want to file it under seal, that's fine…

April 29 Trans. at 7:25-8:4.

[82]    See Doc. No. 30, Exhibit D (emphasis added).

[83]    See May 30 Trans. at 30:13; 31:7-9.

[84]    See May 30 Trans. at 15:22-16:7, and 29:6-21 ("Well, we have an agreement.  I believe we do, and we have leases, and I run the payroll.  There is a legion of evidence…But is there an agreement?  I believe there is an agreement.  I believe there is."); see also May 30 Trans. at 30:22-25; 31:1-2 ("I believe there is an agreement.  I believe that we have an agreement.  We have leases.  We have – I believe that if Mr. Mazzei all of a sudden today said, "There is nothing here," I could sue him saying there's clearly a relationship.  There's clearly an intended action."); see also May 30 Trans. at 74:21-75:13 ("…[T]here's definitely an agreement.  It's an oral agreement.  It was – it's not in writing.  But there is an agreement that Mr. McElrath is taking over the business.").

[85]    Doc. No. 30, p. 3-4.

[86]    See May 30 Trans. at 46:6-11; Doc. No. 30, p. 3-4.

shares in M&A is 765.[87]  Thus, Attorney McElrath currently holds only a 33% stake in M&A, far

short of the amount necessary to have a controlling interest in the firm.[88]

       The trail of inconsistent statements continues to this day.  In motions filed within

days of each other, the parties offered irreconcilable statements concerning Attorney Mazzei's

continued involvement with these cases:

| | |
|---|---|
| October 20, 2014: | "Jason J. Mazzei, Esquire consents to this Motion, and has agreed to provide Attorney McElrath with such services, which are necessary, required or helpful for his representation of the Debtor."[89] |

*     *     *

| | |
|---|---|
| October 27, 2014: | "Attorney Jason J. Mazzei has no association with McElrath Legal Holdings, LLC and provides no legal service in any manner."[90] |

Such statements are further discredited by Attorney Mazzei's prior claim that he is only

practicing law to the extent necessary to close out the remaining 147 cases which remain in the

name of M&A.  He left no doubt that once the cases are completed (or transferred), he no longer

intends to practice law: [91]

| | |
|---|---|
| Mr. Dresbold: | And your ultimate goal is to get out of the legal business, is that correct? |
| Mr. Mazzei: | Correct. |

---

[87]    May 30 Trans. at 46:12-23.

[88]    Id. at 48:7-9.

[89]    In re Moorefield, Case No. 10-20977-CMB, Doc. No. 58, ¶ 8.

[90]    In re Glasser, Case No. 11-22881-GLT, Doc. No. 44, ¶ 7.

[91]    May 30 Trans. at 18:18-22; see also Audio Transcript of Proceedings dated June 27, 2014, 2:06:50 to 2:12:48 ("I am no longer practicing in this Court…Regardless of the outcome [of pending misconduct proceedings], I do not plan on practicing in this Court…"); Audio Transcript of Proceedings dated September 26, 2014, 1:41:36 to 1:46:30 and 1:49:21 to 1:50:51 ("my intention right now is not to continue to practice in this Court…I do not plan on practicing again…").

As recently as November 5, 2014, Attorney Mazzei filed statements with the Court that appear to be patently false.[92]  In his motion, Attorney Mazzei challenged the Court's characterization of a motion to substitute counsel.  Specifically, Attorney Mazzei disputes that he was a party to the motion and denies that he made "assertions, allegations or requests therein."[93]  Yet, an examination of the *Motion for Substitution of Counsel* shows that all terms contained within the motion were explicitly "agreed to" by Attorney Mazzei and his electronic signature appears on the document.  In fact, the motion expressly states that Attorney Mazzei "consents to [the] [m]otion, and has agreed to provide Attorney McElrath with such services, which are necessary, required or helpful for his representation of the Debtor."

For these reasons, the Court does not find Attorney Mazzei's testimony regarding the transaction with Attorney McElrath to be credible.  His statements are contrary to the actions undertaken in the Fall of 2013 and are belied by a motivation to preserve his license to practice law.  The Court likewise does not find Attorney McElrath's statements to be compelling regarding the existence of a written agreement.  The Court finds it inconceivable that Attorneys Mazzei and McElrath would transfer a business enterprise with annual revenues exceeding $1,000,000 dollars without a written agreement.  These are seasoned attorneys who understand the necessity of legal documentation.  Indeed, it would have been highly irresponsible for the parties not to have an agreement in place considering that the fortunes of over 1,000 clients and the livelihoods of 15 employees hung in the balance.

Consequently, the Court concludes that Attorney Mazzei agreed to sell his practice to Attorney McElrath (through their respective corporate forms) for cash and the

---

[92]    See *Motion to Enforce Compliance with Order of Recusal Dated June 9, 2014,* [Doc. No. 88].

[93]    Id. at ¶ 9.

assumption of certain liabilities.[94]  After discovering the potential consequences of Conduct Rule

1.17, Attorney Mazzei sought to recharacterize the sale, but by then, it was too late.   The asset

transfer had already occurred and sufficient consideration had been tendered.

The Court further concludes that the parties consummated the sale on September

1, 2013, the date when all M&A employees began their employment with MLH.  While portions

of M&A's assets may have been previously transferred, September 1 reflects the day M&A was

no longer an independently operating law firm.   Without employees to work the cases and

generate revenue, M&A became a shell of its former self.  Conversely, MLH had no operational

capacity until September 1, when it gained a staff and became fully functional.  This date will

therefore be determinative in assessing the parties' respective rights on other issues.

## B.    Transfer of Cases.

Now that the Court has determined that Attorney Mazzei conducted a sale of

M&A's assets, the Court must determine whether the cases can be transferred to MLH.

According to the March 7 Order, Attorney McElrath is counsel of record in each of the affected

cases.  Because the firm affiliation was not changed, M&A remains the designated payee for any

distribution from the Trustee.  Attorney McElrath seeks to change this result by modifying the

March 7 Order.

Attorney McElrath contends the March 7 Order should be amended because it

does not reflect the original intent of the parties in filing the *Motion to Withdraw*.  He claims the

*Motion to Withdraw* was filed for the purpose of transferring cases between law firms rather than

---

[94]    See July 31 Trans. at 22:12-17.   Attorney Mazzei has therefore financed the deferred payments until such time as MLH satisfies its remaining obligations to M&A.  Because the nature and amount of these payments were not disclosed, the Court makes no ruling regarding the propriety of such payments at this time.  The Court may revisit this issue in the context of the disciplinary proceeding pending at Case No. 14-205-GLT.

between individual attorneys.   As a result, he asks that the March 7 Order be modified to expressly authorize the substitution of MLH as counsel of record.

The Court will not amend the March 7 Order for two reasons.   First, Attorneys Mazzei and McElrath did not comply with the Pennsylvania Rules of Professional Conduct when attempting to transfer the cases between M&A and MLH, so it is premature to consider the request.   Second, the March 7 Order granted the relief sought by the parties and they have not established a sufficient basis to vacate or amend it.

### 1.    The Parties Did Not Comply with the Pennsylvania Rules of Professional Conduct.

Under Conduct Rule 1.16, a lawyer may terminate his representation of a client if, *inter alia*, the withdrawal can be accomplished without material adverse effect on the interests of the client or other good cause exists.[95]   In this District, an attorney may withdraw his appearance only with leave of the Court and after providing "reasonable notice to the client."[96]   The Court's practice is to consider such requests upon the filing of a written motion.   A motion must be served upon the parties against whom relief is sought in sufficient time to provide them with an opportunity for a hearing.[97]   Attorneys Mazzei and McElrath did not serve a copy of the original substitution motions upon the affected clients.    In fact, the clients were not identified as respondents until the Court directed them to be designated in this manner.[98]   As such, Attorneys Mazzei and McElrath did not comply with Conduct Rule 1.16 because the individual clients

---

[95]    See Pa. R.P.C. 1.16(b)(1) and (b)(7).

[96]    W.PA.LBR 9010-2(b).

[97]    See Fed.R.Bankr.P. 9013, 9014 and W.PA.LBR. 9013-5.   See also Pa.R.P.C. 1.16(d) (upon the withdrawal of an attorney's representation of a client, counsel "shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client" and "allowing time to protect a client's interests.").

[98]    See Doc. No. 3.

were not given notice of the requested relief or the opportunity to be heard as required by applicable law.

Conduct Rule 1.17 works in concert with Conduct Rule 1.16 by imposing additional requirements when an attorney sells his law practice.  Conduct Rule 1.17 requires actual written notice to each client containing the following minimum information regarding the proposed transaction:

(1)   Notice of the proposed transfer of the client's representation, including the identity and address of the purchasing lawyer;

(2)   A statement that the client has the right to representation by the purchasing lawyer under the preexisting fee arrangements;

(3)   A statement that the client has the right to retain other counsel or to take possession of the file; and

(4)   A statement that the client's consent to the transfer of the representation will be presumed if the client does not take any action or does not otherwise object within 60 days of receipt of the notice.[99]

Irrespective of whether a "sale" occurred, the Court finds that the notice requirements of Conduct Rule 1.17(c) nonetheless apply to the transfer of substantially all of the cases from one law firm to another.  The notice alerts clients to an impending bulk transfer of cases and advises them of the right to seek alternative representation.  It also reinforces the acquiring attorney's obligation to continue the client representation under the terms of the pre-existing fee agreement. Through these disclosures, the notice provides clients with adequate information necessary to make an informed decision concerning their ongoing legal representation.[100]   Because the clients' chosen lawyer was involuntarily changed (the action was not initiated by the client)

---

[99]   Pa. R.P.C. 1.17(c).

[100]   See Pa. R.P.C. 1.17 cmt. ¶ 5.

through a transfer of firm assets, the Court concludes that a notice containing the minimum

information set forth in Conduct Rule 1.17(c) should have been provided.

The communications (Forms A and B) sent to M&A's clients fail to meet the

minimum standards required by Conduct Rule 1.17.  The cover letters attached to Forms A and B

identified Attorney McElrath as "lead counsel," but did not apprise clients of the opportunity to

retain alternative counsel if they so desired.  The letters also neglected to mention that if no

objection to the substitution was filed within 60 days, the client was deemed to have consented to

the replacement counsel.  The notices also failed to provide any information concerning Attorney

McElrath's education, professional history, and his relevant bankruptcy experience.  Although

attorney background information is not necessarily required by Conduct Rule 1.17(c), the

explanatory comments to the rule make it clear that the disclosure of such information facilitates

a finding that adequate information was supplied.  For these reasons, the Court finds that notice

was not properly provided to M&A's clients and will need to be re-issued in a manner consistent

with Conduct Rule 1.17.

Attorneys Mazzei and McElrath claim the need for such notice is obviated by the

fact they obtained affirmative consents from over 900 clients.  While it is true that consent can

eliminate the need for notice and a hearing (see generally In re Bleu Room Experience, Inc., 304

B.R. 309, 315 (Bankr. E.D. Mich. 2004)), the Court finds that the consents at issue here are

ineffective because the clients were not given the minimal disclosures necessary to make a

knowing and informed decision.  First and foremost, the letters fail to disclose that all cases are

being transferred to a new law firm.  In each letter (sent on M&A letterhead), M&A's clients

were led to believe that they would remain clients of M&A.  They were not told of the plan to

transfer all cases to MLH, and aside from a brief reference in Form B, the identity of the new

firm was not disclosed.  The clients were also told that Attorney Mazzei would continue to work on their cases, a statement the Court now finds to be untrue.  The incomplete and inconsistent letters sent by Mazzei and McElrath confounded this Court, and it has no doubt their clients were similarly confused.  From this record, the Court concludes that the clients did not have full knowledge of the requisite facts, thereby negating their ability to provide consent to the proposed transfer.

### 2.    The Motion to Withdraw Was Unclear.

The *Motion to Withdraw* contains no request to change the designated law firm on each case, nor does the phrase "McElrath Legal Holdings, LLC" appear anywhere in the document.  When it approved the requested transfer, the Court adopted the language in the proposed order submitted by the parties by using "Jason J. Mazzei" and "Paul W. McElrath, Jr." as the lawyers between whom the cases would be transferred.[101]  Accordingly, the March 7 Order granted the precise relief the parties requested.  If a different outcome was desired, the parties have no one else to blame but themselves.[102]  It is not the duty of the Court to divine the intent of the parties from their written motions.

Additionally, the Court will not modify the March 7 Order because the parties have not substantiated grounds upon which relief can be granted.  Specifically, no basis for

---

[101]    While the *Motion to Withdraw* suggests the client consents are "held in the Law Offices of Paul McElrath," it is unclear whether this was intended to specify the physical location of the consents or suggest the presence of a new law firm.  See Doc. No. 11.  The Court is not aware of any entity bearing the name "Law Offices of Paul McElrath" and it appears merely to be a trade name used by Attorney McElrath.  Even if such an entity exists, it does not change the Court's analysis since the name was omitted from the proposed order.

[102]    The Court notes that no appeal was taken from the March 7 Order.  Until the *Motion to Modify* was filed, the parties made no effort to seek reconsideration.

modification has been established under Fed. R. Civ. P. 60(b).[103]  Although it appears the parties

could claim mistake, inadvertence, or excusable neglect, they can only make this showing with

the benefit of hindsight.   At the time the March 7 Order was issued, the record contained

insufficient evidence for the Court to conclude that a transfer between law firms was intended.

The parties offered few details concerning their transaction and Attorney McElrath still signed

his pleadings under an association with "Mazzei & Associates."   The record was therefore

devoid of any factual basis to support a transfer of the cases to MLH.

It is only with the benefit of testimony and documents produced after April 28

that the Court can reach a different conclusion.   During those subsequent hearings, the parties

established the existence of a transaction which could justify the transfer of cases between law

firms under certain circumstances.   The parties detailed the involvement of MLH and more fully

explained its role in the series of events presented to the Court.   None of these facts were

available to the Court when it issued the March 7 Order.   As such, those same facts cannot

support a finding of mistake or inadvertence on the part of the Court.   Moreover, the parties were

in possession of this information when the *Motion to Withdraw* was filed, yet they failed to

provide it to the Court and offer no explanation for such an oversight.   For this reason, the Court

will not grant relief from the March 7 Order because the late submissions neither constitute a

basis to find excusable neglect nor constitute newly-discovered evidence.

Although it will not disturb the March 7 Order, the Court will consider

authorizing the substitution of cases from M&A to MLH upon the filing of a new motion to

withdraw.   The parties should be advised, however, that the Court will only consider a new

motion after the parties demonstrate compliance with the notice provisions of Conduct Rule

---

[103]     Pursuant to Bankruptcy Rule 9024, Civil Rule 60 applies in cases brought under the Bankruptcy Code.
Fed.R.Bankr.P. 9024.

1.17(c).  MLH is therefore directed to send the requisite disclosures to all clients it seeks to represent, and to file a specimen document with the Court.  In the event that some clients withdraw the consent previously provided with Form A or B, MLH shall be prepared to disgorge the fees associated with those cases.

## C.   Fee Sharing Under Section 504 of the Bankruptcy Code.

Having determined that, as part of the sale, M&A assigned its client inventory and accounts receivable to MLH, the Court must now determine whether the payment to MLH of fees earned by M&A (but not yet paid to M&A) constitutes impermissible fee sharing.  Section 504 of the Bankruptcy Code contains a broad prohibition against the sharing of compensation awarded under sections 330(a) and 503(b)(4).  It provides that:

> (a) Except as provided in subsection (b) of this section, a person receiving compensation or reimbursement under section 503(b)(2) or 503(b)(4) of this title may not share or agree to share—
>
> (1) any such compensation or reimbursement with another person; or
>
> (2) any compensation or reimbursement received by another person under such sections.

11 U.S.C. § 504(a).  The restriction applies to compensation payable to counsel for a debtor in a chapter 13 proceeding.  See 11 U.S.C. § 330(a)(4)(B).  A narrow exception to the statute exists in section 504(b)(1) which allows fee sharing between lawyers in the same professional association,[104] corporation, or partnership.  11 U.S.C. § 504(b)(1).[105]  Although not an express exception, courts have authorized fee arrangements between unaffiliated professionals when they

---

[104]   In this context, a "professional association" has been interpreted to mean a recognized legal entity, the members or employees of which have some identifiable legal relationship to one another.  See In re Matis, 73 B.R. 228 (Bankr. N.D.N.Y. 1987).

[105]   A second exception exists for professionals representing petitioning creditors in an involuntary bankruptcy proceeding, but this exception is not relevant here.  See 11 U.S.C. § 504(b)(2).

are fully disclosed and approved by the court in advance of any employment or work activity.

See  In re Ferguson, 445 B.R. 744, 752 (Bankr. N.D. Tex. 2011) (requiring the use of contract

employees to be disclosed and approved by the court at the time of a firm's employment).

    Courts have long recognized that fee sharing between attorneys in a bankruptcy

case violates public policy.  See Weil v. Neary, 278 U.S. 160 (1929).  It has been noted that fee

sharing "subjects the professional to outside influences over which the court has no control,

which tends to transfer from the court some degree of power over expenditure and allowances."

In re Winstar Commc'ns, Inc., 378 B.R. 756, 760 (Bankr. D. Del. 2007) (quoting 4-504 *Collier*

*on Bankruptcy* P. 504.01) (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2007); see

also Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.), 655 F.2d 463,

470 (2d Cir. 1981), *cert. denied*, 455 U.S. 941 (1982).  Fee sharing may also inflate the cost of

bankruptcy by giving the professionals who are sharing the fees an incentive to upwardly adjust

the fees to maximize each attorney's ultimate share.  In re Worldwide Direct, Inc., 316 B.R. 637,

649 (Bankr. D. Del. 2004).  To combat these concerns, section 504 was enacted with the purpose

of preserving "the integrity of the bankruptcy process so that the professionals engaged in

bankruptcy cases attend to their duty as officers of the bankruptcy court, rather than treat their

interest in bankruptcy cases as 'matters of traffic.'"  In re Winstar Commc'ns, Inc., 378 B.R. at

760 (citing 4-504 *Collier on Bankruptcy* P. 504.02[1], at 504-5).  Due to this standard, fee

sharing is prohibited in bankruptcy cases even when such arrangements might otherwise be

permissible under other applicable law.  Compare Worldwide Direct, 316 B.R. 637; and In re

Age Refining, Inc., 447 B.R. 766, 798-99 (Bankr. W.D. Tex. 2011); and In re Smith, 397 B.R.

810, 818 (Bankr. E.D. Tex. 2008); with Conduct Rule 1.5(e) (identifying circumstances in which

fees may be divided among lawyers from different firms).

A violation of section 504 may occur whenever the following three elements are satisfied:

(1)    A person or entity was awarded compensation under section 503(b)(2) or section 503(b)(4);

(2)    A person or entity shared or agreed to share in the awarded compensation; and

(3)    The person or entity that shared the compensation does not fit within one of the statutory exceptions.

See In re Smith, 397 B.R. at 817.  Once a violation is found, the penalties for improper fee sharing may be harsh.  The presumptive remedy is denial or disgorgement of compensation.  See, e.g., id.  (requiring disgorgement of more than $114,000 in fees); In re Ferguson, 445 B.R. 744 ("Generally, a finding of improper sharing of compensation results in a denial or disgorgement of compensation"); In re Matis, 73 B.R. at 234 (court retains discretion to deny compensation, compel return of fees, or such other relief as may be appropriate); In re Greer, 271 B.R. 426 (Bankr. D. Mass. 2002) (disgorgement will be considered upon review of fees found to be in violation of section 504); In re Egwu, 2012 WL 5193958 (Bankr. D. Md. Oct. 19, 2012) (requiring all fees to be disgorged).

Upon reviewing the current situation, the Court finds that the first and third elements are satisfied.  As counsel for various chapter 13 debtors, M&A's fees were allowed as administrative expenses under section 503(b)(2).   M&A claimed the "no look" fee provided by W.PA.LBR. 2016-1 or obtained Court approval of its fee applications.  It was subsequently paid (or is entitled to be paid) compensation pursuant to section 330(a).

The Court also finds that neither M&A nor MLH fit within the exceptions of section 504(b)(1), thereby satisfying the third element.  M&A has no affiliation with MLH.  The two entities are not members, partners, or associates in a professional association, corporation, or

partnership.  If the fees were deemed payable to Attorney Mazzei rather than M&A, the requisite relationship is similarly lacking.  Attorney Mazzei is not affiliated with MLH and does not hold an equity stake in that firm.  Aside from the seven months he worked as an MLH employee, all ties between Attorney Mazzei and MLH (to the extent they existed) were severed.[106]  Because the Court has never authorized the distribution of M&A's compensation to MLH,[107] the channeling of funds to MLH through the Citizens Bank account appears to be the type of phantom compensation and fee sharing that section 504 was designed to prevent.  See In re ACandS, Inc., 297 B.R. 395 (Bankr. D. Del. 2003) (operational subsidiary is a separate entity that requires separate retention application in order to avoid illegal fee sharing); In re Matis, 73 B.R. 228 (lack of relationship between attorneys prevented sharing of prepetition retainer).

The critical inquiry for the Court is the second element:  Did MLH and M&A share compensation?  In the context of bankruptcy compensation, sharing would consist of taking an existing fee and splitting it among two or more professionals with each having a present and concurrent right to payment.

On its face, the arrangement between M&A and MLH would appear to be fee sharing.  In each case, M&A earned a minimum fee.  A portion of the fee was paid to M&A as a retainer, and the remainder of the fee is paid over time from the plan distributions.  To the extent any portion of the unpaid fee remains as of September 2013, MLH will collect it.

The distinguishing factor that excepts this arrangement from the definition of fee sharing is that M&A and MLH do not have simultaneous claims to the same fee.  Through the

---

[106]   While Attorney McElrath may qualify as an "associate" or "member" of M&A during certain periods relevant herein, it does not alter the Court's analysis.  Because the funds were deposited into an account owned by MLH, the MLH firm is the entity which must be examined for the purposes of fee sharing.

[107]   The Court acknowledges that several bridge orders were entered which authorized the Trustee to release funds to MLH on a conditional basis.  See Doc. No. 44.  As expressly noted in each Order, however, the Court provided such "extraordinary and interim" relief and refrained from making a substantive ruling on the fee sharing issue.

assumption and assignment of the respective fee agreements during the sale,[108] MLH stands in

the shoes of M&A for those cases ultimately transferred to MLH.  M&A's claim to the

receivables is extinguished because it no longer holds an engagement agreement with the

respective debtors.  The right to collect those fees is now held by MLH.  Accordingly, the sale

date bifurcates the fees between buyer and seller and there is no concurrent right to payment.

Amounts paid prior to the sale remain the property of M&A, while distributions paid after the

sale belong to MLH.  The parties are therefore not engaging in fee sharing in violation of section

504 of the Bankruptcy Code because only the purchaser can collect the fees after the sale date.

   In reaching this conclusion, the Court also relies upon the unique circumstances

that exist when a law practice is sold in Pennsylvania.  Generally, the parties to a sale of a

business can allocate the payment of receivables in any manner they wish.  The same cannot be

said with respect to a sale of a legal practice.  Pursuant to Conduct Rule 1.17, once a practice is

sold, the seller may no longer engage in the private practice of law in Pennsylvania.[109]  Indeed,

the seller may file for inactive status as provided in Disciplinary Rule 2.19(j) by filing a Request

for Inactive Status (Form DB-28)[110] or he may allow his license to lapse.[111]  Upon attaining

---

[108] See Doc. No. 68, ¶ 7 and Exhibits B and C; see also Doc No. 30, p. 3 and Exhibits G and H.

[109] See Pa. R.P.C. 1.17(a).

[110] See Pa. R.P.C. 219(j) ("An attorney who is not engaged in practice in Pennsylvania, has sold his or her practice pursuant to Rule 1.17 of the Pennsylvania Rules of Professional Conduct, or is not required by virtue of his or her practice elsewhere to maintain active licensure in the Commonwealth may request inactive status or continue that status once assumed."). See also http: //www.padisciplinaryboard.org/documents/DB-28_fillable_form.pdf, last visited on October 28, 2014.

[111] See Pa. R.P.C. 5.5(b).

inactive status,[112] an attorney may not resume practice until reinstated by order of the Pennsylvania Supreme Court.[113]

      Because the sale effectively terminates Attorney Mazzei's ability to practice law in Pennsylvania (either because he will file for inactive status or allow his license to lapse), he cannot accept fees paid to MLH after the sale date.[114]  Here, the Court acknowledges the distinction between the collection of fees from accounts receivable versus cash consideration paid for the sale of assets.  The accounts receivable become the sole property of the purchaser and only the purchaser can pursue collection of the claims.  For this reason, the Court finds that a sale precludes Attorney Mazzei from making claims for receivables that were transferred to MLH as part of the sale.[115]

      The dangers of fee sharing are not present in the current context.  To begin, none of the accrued fees are being paid to MLH without a court order.  With the benefit of judicial oversight, the entire transaction must be fully disclosed and vetted before the Court will authorize distributions to the acquiring firm.  The Court is therefore not faced with a professional lurking in the shadows who is not accountable for actions taken in the case.  The Court also found that a sale of the practice has occurred based upon the information provided by the parties.  Through the sale, MLH is the substitute for M&A and will prospectively serve as counsel to the

---

[112]    The Conduct Rules make a distinction between active lawyers who are authorized to practice law and those who are technically "admitted" but have an inactive license.  See Pa. R.P.C. 5.5(c), (d), and cmt. 7 ("The word 'admitted' in paragraph (c) contemplates that the lawyer is authorized to practice in the jurisdiction in which the lawyer is admitted and excludes a lawyer who while technically admitted is not authorized to practice, because, for example, the lawyer is on inactive status.").

[113]    See Pa. R.D.E. 218(a)(3).

[114]    Non-lawyers cannot accept fees from lawyers, and none of the exceptions found in Conduct Rule 5.4(a)(1)-(5) apply to Attorney Mazzei.

[115]    Outside of a sale context where the protections of the Rules of Professional Conduct apply, a transfer of fees from M&A to MLH could constitute impermissible fee sharing under certain circumstances, thereby rendering the fees subject to disgorgement.  Because the Court has concluded that a sale occurred, it need not address that issue at this time.

debtors.  By transferring its assets in a sale, M&A irrevocably relinquished its right to collect any additional fees in the assigned cases.  Without an overlap in the claims, the Court is not confronted with two law firms allocating the same fee, or having the incentive to drive up legal expenses in an effort to maximize their respective shares.  The Court will therefore authorize the distribution of fees to MLH in the Transferred Cases once it is satisfied that MLH complied with the notice requirements of Conduct Rule 1.17.

By virtue of the sale structure, most of the fees MLH seeks are excluded from the ambit of improper fee sharing, but not all of the fees are immune.  The Court has identified two situations where fee sharing may yet exist.  It will discuss each of these in turn.

### 1.    Fees Earned in Non-Transferred Cases.

While the overall structure of the sale may withstand initial scrutiny, the Court is nonetheless troubled by the commingling of assets that were not part of the transaction or for which a transfer has not yet been approved.  In particular, MLH appears to have exercised control over all M&A cases, irrespective of whether Attorney McElrath is counsel of record.  This includes cases in which clients have not consented to representation by MLH (collectively, the "Non-Transferred Cases").  MLH is therefore providing legal services on cases where it does not have an engagement agreement or an established attorney-client relationship.

Since September 2013, MLH has taken possession of all fees payable to M&A on account of its chapter 13 cases.  Each month, M&A's distribution has been deposited into the Citizens Bank account.  To compound this problem, MLH is collecting all fees paid on the Non-Transferred Cases.  The fees are deposited into the Citizens Bank without attribution.[116]  MLH makes no attempt to distinguish these fees from those that are payable on the Transferred

---

[116]    See July 31 Trans. at 15:9-19, 21-22.

Cases.[117]   Consequently, MLH uses the proceeds of the bank account to pay the firm's operational expenses without regard to whether the funds are property of M&A or MLH.[118] Even if the funds were segregated, MLH makes no effort to track the amount of time spent working on M&A matters, and the staff does not treat M&A cases differently from MLH cases. Attorney Mazzei has not received any money from distributions paid on the Non-Transferred Cases after September 2013.[119]   From this evidence, the Court concludes that MLH has retained all revenues (including any related profits) derived from the Non-Transferred Cases since September 2013.

Although MLH would like to keep these engagements, it has not obtained the requisite client consents and therefore has no basis to collect the fees payable in the Non-Transferred Cases.   Contrary to the Transferred Cases where the fee agreement was assigned to Attorney McElrath with the consent of the client, here no transfer has yet occurred.   MLH therefore has no right to retain payment for the Non-Transferred Cases, notwithstanding any work it may have performed.   The fees accruing on the Non-Transferred Cases therefore must remain with M&A.

The fact that fees on the Non-Transferred Cases were paid to MLH without credit, allocation, or payment of any sort borders on the type of fee sharing prohibited by section 504 of the Bankruptcy Code.   Accordingly, to remove the cloak of impermissible fee sharing, MLH shall provide an accounting regarding fees received since September 1, 2013 on all Non-Transferred Cases.   In the event MLH is not retained by the clients in the Non-Transferred Cases,

---

[117]        Id. at 21-22.

[118]        Id. at 22:5-8.

[119]        Id. at 22:9-11.

MLH may be required to disgorge any fees received on these particular cases. The Court will revisit this issue after MLH complies with Conduct Rule 1.17 and the Court is advised as to whether any M&A clients declined to retain MLH as their bankruptcy counsel.

## 2.    Fees Paid to M&A in Transferred Cases.

Within the category of Transferred Cases, there is a subset of cases for which Attorney Mazzei continues to file fee applications. Because this Court previously found that M&A transferred its assets to MLH on September 1, 2013, M&A should not be filing any fee applications in these particular cases.

There is no clearer example of fee sharing than when one attorney sells his practice (including all accounts receivable) to another attorney and then files a fee application seeking payment from clients he no longer represents. As discussed *supra*, the crux of the sale is that it terminated M&A's right to collect receivables after September 1, 2013. M&A likewise entered into a stipulation providing for future distributions to be payable to MLH.[120] Despite this, the Court identified several fee applications filed by M&A and Attorney Mazzei for cases listed in the *Motion to Withdraw* and for which the parties expect MLH to be counsel.[121] Each application requested payment for fees earned after the assets were transferred to MLH.[122]

These applications present yet another example where the parties' statements patently conflict with their actions. By filing fee applications in cases which have been transferred to Attorney McElrath, Attorney Mazzei appears to have violated Conduct Rule 1.17

---

[120]    See Doc. No. 17.

[121]    See ex., In re Robinson, Case No. 13-10878-TPA, Doc. No. 187; In re Geary, Case No. 10-21809-JAD, Doc. No. 149; In re Retter, Case No. 11-25888-GLT, Doc. No. 76; and In re Stefanik, Case No. 09-26983-CMB, Doc. No. 57.

[122]    The Court recognizes that Attorney McElrath is listed as a party to the fee applications. Simply including Attorney McElrath on the application, however, does not cure the deficiency. Because Attorney Mazzei sold his practice, his name should not appear anywhere on the application.

and Bankruptcy Code section 504(a).  Since this particular issue takes on greater importance in light of the Court's determination that a sale occurred, additional information is required before a final assessment can be made.   The Court therefore requires Attorney Mazzei to file a supplemental list of all cases in which M&A and/or Attorney Mazzei have filed a fee application after September 1, 2013, regardless of whether Attorney McElrath joined in the application.  The list shall identify the case name, docket number, and include an itemization of all fees and expenses received between September 1, 2013 through the date of this Opinion.  The Trustee shall verify this statement against her own records.  Attorney Mazzei shall also file a sworn statement with respect to any additional fees or other consideration he received or expects to receive on account of the M&A assets, including its former inventory of cases.

### D.   Future Proceedings.

The Court is dismayed by Attorney Mazzei and McElrath's blatant disregard for the statutes and procedures governing attorney conduct, particularly with respect to the transfer of the M&A law practice.  While Attorney Mazzei has been under the intense scrutiny of this Court and his conduct is under review by the Disciplinary Board of the Supreme Court of Pennsylvania, he continues to act as though the rules do not apply to him.  Attorney McElrath is not much better.  The Court expects the gamesmanship that has consumed the past year to end and the side-stepping explanations to stop.  Through this ruling, the focus should now return to the representation of each client and the orderly transition of cases.

The Court offers the following as a roadmap for future proceedings now that it has determined that a sale from M&A to MLH occurred.  The Court expects MLH to send every M&A client existing as of September 1, 2013 (including, but not limited to, those clients who are the subject of a Transferred Case, a Non-Transferred Case, or any other case that was omitted

from the Exhibit A to the *Motion to Withdraw*) a sale notice in compliance with Conduct Rule 1.17.  At least 75 days after the sale notice is issued, M&A and MLH may file an amended motion to withdraw/substitute with respect to all M&A cases.  Until an order is entered on the amended motion, MLH shall file a monthly listing of all debtors (by name and case number) who have refused to have their case assigned to MLH or otherwise seek new counsel (collectively, the "Departing Clients").  MLH shall also file an accounting of all fees paid by the Trustee to MLH after September 1, 2013 on account of the Departing Clients' cases.  M&A shall also file an accounting of all fees paid by the Trustee to M&A after September 1, 2013 on account of the Transferred Cases.  The Trustee is likewise directed to file an accounting consistent with those required by MLH and M&A.  Upon review of these documents, the Court will be prepared to enter a suitable substitution Order and will determine the propriety of any fees paid to date to the respective parties.

An appropriate Order will be entered.


Dated:  November 10, 2014

_____
GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY JUDGE

Case Administrator to Serve:
Chief Judge Jeffery A. Deller
Judge Thomas P. Agresti
Judge Carlota M. Böhm
Ronda J. Winnecour, Esq.
Joseph Sisca, Esq.
Jason J. Mazzei, Esq.
Paul W. McElrath, Esq.